IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

FLOYD JUNIOR JAYCOX                    §
   TDCJ-CID #1220652                   §
                                 §
VS.                                    §        C.A. NO. C-05-462
                                 §
PAUL A. MORALES, ET AL.                §

## MEMORANDUM OPINION AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a civil rights action brought by a state prisoner alleging claims of deliberate

indifference to his health and safety (D.E. 1). Defendants move for summary judgment to dismiss

plaintiff's claims on the grounds of qualified immunity (D.E. 62). Plaintiff has filed a response in

opposition (D.E. 64). For the reasons stated herein, defendants' motion for summary judgment is

GRANTED, and plaintiff's claims are dismissed.

## I. JURISDICTION

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C.

§ 1331.

## II. BACKGROUND AND PLAINTIFF'S ALLEGATIONS

Plaintiff is in the custody of the Texas Department of Criminal Justice, Criminal Institutions

Division ("TDCJ-CID"), and at all times relevant to the facts of this lawsuit was incarcerated at the

McConnell Unit in Beeville, Texas, where he is housed currently. Plaintiff is a former member of

the prison gang Hermones Pistodes Latinos (H.P.L.). He filed suit on September 14, 2005, claiming

that defendants failed to protect him from an assault by active H.P.L. members. He named as

defendants the following McConnell Unit officers and officials: Warden Paul A. Morales; Assistant Warden R. Crites; Captain Evelyn Castro; Major Brian Gordy; Captain Catherine Nelson; and Sergeant Gamaliel Olvera.  Following an October 18, 2005  Spears[1] hearing, Warden Crites was dismissed from this case (D.E. 12), and service was ordered on the remaining defendants (D.E. 13).

On November 14, 2005, plaintiff filed a motion for preliminary injunction requesting that the TDCJ be ordered to house him on E-pod or F-pod where the cells have plexiglass on the cell-door windows so that he would not be "speared" by other inmates (D.E.21).  The Attorney General filed an *amicus curiae* response stating that plaintiff was housed on E-pod in a cell with a plexiglass window such that his motion was moot (D.E. 31).  A hearing was held on January 12, 2006, at which plaintiff admitted he was not in danger because he was housed in a cell with plexiglass as requested, and his motion for injunctive relief was denied (D.E. 40).

On January 24, 2006, plaintiff filed a second motion for preliminary injunction, stating that he had been moved to A-pod within Administrative Segregation ("Ad-Seg"), and complaining that the cells there did not have plexiglass over the cell door windows, such that his life was in danger (D.E. 38).  On February 23, 2006, defendants filed a response, including the affidavit of Warden Paul Morales (D.E. 44). Warden Morales explained that plaintiff had been moved to A-pod of Ad-Seg due to his line classification, Line 1, that entitled him to certain privileges, such as commissary and property, not available to Line 2 or Line 3 inmates, and that only Line 2 or Line 3 inmates are housed in the E-pod or F-pod sections of Ad-Seg.  Id.

---

[1] Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985); see also Eason v. Holt, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a Spears hearing is incorporated into the pleadings).

On March 1, 2006, a hearing was held on plaintiff's second motion for preliminary injunction, and, on that same day, plaintiff filed a motion to amend his complaint (D.E. 45), stating that on February 26, 2006, he had been "speared" in the A-pod dayroom. The hearing was rescheduled to allow plaintiff to file a life in danger ("LID") complaint with prison officials.

On March 23, 2006, a hearing was held on plaintiff's second motion for preliminary injunction and motion to amend. By Memorandum Opinion and Order entered March 29, 2006, the Court denied plaintiff's second motion for preliminary injunction finding that his LID claims had been investigated and, because he was unable to identify any specific inmate that had threatened him, he could not prove that defendants failed to take reasonable measures to abate a known substantial risk of serious harm (D.E. 48). Plaintiff was granted leave to amend his complaint to allege that defendants failed to protect him from an attempted spearing on February 26, 2006 (D.E. 49).

On May 22, 2006, Captain Nelson was dismissed and Lieutenant Pena was substituted as a defendant per plaintiff's motion (D.E. 58).

Defendants filed the instant motion for summary judgment on June 21, 2006 (D.E. 62). Plaintiff filed his response on July 24, 2006 (64). According to his original complaint (D.E. 1) and amended complaint (D.E. 45), plaintiff seeks damages for the scarring to his right arm and for mental pain and anguish.

### III.  SUMMARY JUDGMENT EVIDENCE AND UNCONTESTED FACTS

In support of their motion for summary judgement, defendants offer the following:

Ex. A:  Portions of plaintiff's LID requests and investigations for March 17, 2004 through December 29, 2005;

Ex. B.  Portions of plaintiff's classification records;

Ex. C:  Portions of Security Threat Group Management Officer Records relating to plaintiff;

Ex. D:  Portions of plaintiff's grievance records;

Ex. E:  Portions of Emergency Action Center Records pertaining to plaintiff;

Ex. F:  Portions of plaintiff's McConnell Unit medical records;

Ex. G:  Portions of plaintiff's LID requests and investigations for December 29, 2005, through May 8, 2006; and

Ex. H:  Transcript of March 23, 2006, hearing on plaintiff's second motion for preliminary injunction.

See D.E. 62, attached exhibits.

In his one-page summary judgment response (D.E. 64), plaintiff argues that there are "grave issues of fact" that make summary judgment impossible, and he maintains that defendants "will not protect [him] as of today."  Id..

The following facts are not in dispute:

Plaintiff entered the TDCJ on March 17, 2004, and at that time, he was a confirmed member of the H.P.L.  *Ex. A at 22.*  On June 20, 2004, plaintiff signed a renouncement form and began the disassociation process from the H.P.L. gang.  *Ex. A at 22; Ex. H at 89.*  The disassociation process and corresponding investigation to confirm and complete that disassociation  can take one to three years.  *Ex. H at 89.*

On June 17, 2005, plaintiff sent an I-60 request to Sergeant Olvera relating that other inmates had told him active H.P.L. members were going to assault him with a homemade spear. *Ex. A at 8.* Plaintiff stated that he needed to remain on E-pod in a cell with a plexiglass window to ensure that he would not be speared.  *Id.*

Sergeant Olvera forwarded the I-60 to the Unit Classification Committee ("UCC") so that a LID investigation could be initiated. *Ex. A at 6; Ex. H at 93.* Lieutenant Miles conducted the LID investigation, *Ex. A at 6-14*, which included a written statement from plaintiff, dated June 19, 2005. *Ex. A at 10.* In his written statement, plaintiff would not reveal the names of the persons who told him that he was going to be assaulted, explaining:

> Several inmates from D-pod has come to this E-pod in the last 3 – 4 days and telling me that to be careful because my ex H.P.L. gang is plotting to "quote spear me" and they also told me that they will shoot me with a spear if I'm to get moved over there or to a pod without the plexiglass in the door:  I can not reveal the persons' names, dates, or confidential matters.  But I can say that these persons are gangs like the Mexican Mafia-R.U. and I do "legal work" for these people.

*Ex. A at 10.*

The UCC hearing was held on June 27, 2005, at which Warden Morales presided as chairman of the three-person panel. *Ex. A at 14; Ex B at 4.* The UCC denied plaintiff's LID claim on the grounds there was no evidence to support his allegations because plaintiff refused to identify either the persons who informed him about the assault or the offenders that might be a risk to him. *Id.; Ex. A at 11*.

On June 21, 2005, plaintiff was transferred from E-pod to D-pod in Ad-Seg.  The cells in D-pod do not have plexiglass on the cell-door windows.

On July 1, 2005, plaintiff was speared by an active H.P.L. member while in the D-pod, B-section dayroom. *Ex. A at 15.* Following the assault, plaintiff was taken to the medical department for treatment of a "very small superficial puncture wound to his right upper arm." *Ex. F at 1.* Plaintiff's injury was treated with a topical antibiotic ointment and a band-aid. *Id.*

5

Following the July 1, 2005 assault, a LID investigation was initiated by Lieutenant Pena. *Ex. A at 15-23.* None of the D-pod staff witnessed the assault. *Ex. A at 19-21.* Plaintiff identified Ramon Segura as the inmate who threw the spear. *Ex. A at 22.* Officers searched Segura's cell but found no physical evidence to connect him to the assault. *Ex. A at 16.* Segura denied shooting the spear at plaintiff. *Id.* On that same date, plaintiff signed an "Offender Waiver Statement" requesting that no further action be taken on his allegation of life endangerment. *Ex. A at 16.*

On July 7, 2005, plaintiff was transferred from D-pod to E-pod, cell 26.

On July 8, 2005, the UCC reviewed the LID investigation and plaintiff's waiver statement. *Ex. B at 3.* Major Gordy, the UCC chairman, denied plaintiff's request for a unit transfer finding that his new housing assignment in E-pod eliminated the risk to his safety. *Ex. A at 23; Ex. B at 3.*

On August 8, 2005, plaintiff filed an I-60 request asking that he be allowed to remain on E-pod, despite the fact that his line classification was being promoted to line 1,[2] because he believed he was a "target" of retaliation from active H.P.L. members and he was afraid to be housed in a cell area without plexiglass windows. *Ex. A at 26-27.* However, plaintiff failed to identify which inmates posed a risk to his safety. *Id. at 27.* Lieutenant Esparza investigated plaintiff's LID claim. *Ex. A at 25-34.* Lieutenant Esparza noted that the McConnell Unit's Security Threat Group Office ("STGO") had not received any information that plaintiff had been threatened or that his safety was at risk. *Id.* at *46.*

---

[2] Line 1 inmates have privileges that Line 2 and line 3 inmates do not have, such as commissary and property. Plaintiff's promotion to Line 1 would have likely resulted in a move off of E-pod because usually only Line 2 and Line 3 inmates are housed in E-pod and F-pod.

On August 15, 2005, the UCC reviewed plaintiff's LID claim and Lieutenant Esparza's findings. *Ex. A at 34; Ex. B at 3.* The UCC found no evidence to support plaintiff's LID claim and denied his request for a transfer. *Id.*

On August 31, 2005, plaintiff was transferred from E-pod to A-pod, cell 21.

On October 19, 2005, plaintiff claimed that a spear was thrown at him while he was recreating in the A-pod dayroom. *Ex. A at 38.* The spear did not hit him. *Id. at 37.* The weapon was recovered in the dayroom, and a serious incident report was generated. *Id. at 35-41.* The staff members assigned to A-pod did observe the spear being shot into the dayroom, but Officer David Ramirez testified that he found a paper pole with a metal spear. *Id. at 38-41.* As Officer Ramirez escorted plaintiff out of the dayroom, other offenders taunted plaintiff and called him names like "snitch." *Id.*

Following the dayroom incident, plaintiff was transferred from A-pod to E-pod. *Ex. A at 38, 44.* On October 20, 2005, plaintiff filed a LID claim stating that his life was in "grave danger" because active H.P.L. members were also housed on E-pod. *Ex. A at 42.* Lieutenant Esparza initiated a LID investigation and confirmed that there were two active H.P.L. members housed in E-pod, C-section. *Id. at 38-47.* On October 21, 2005, plaintiff was moved to F-pod. *Id. at 44.*

On October 30, 2005, plaintiff sent an I-60 to Major Gordy seeking protection and a unit transfer. *Ex. A at 48-49.* Plaintiff alleged there was a "hit" out on him by H.P.L. and other gang members because it was rumored that he was an informant. *Id.* Plaintiff specifically requested that Major Gordy *not* come talk to him or take him out of his cell. *Id.*

On November 2, 2005, a LID investigation was initiated based on plaintiff's latest LID claim. *Ex. A at 48-60.* The investigation revealed that there were no active H.P.L. members on F-

7

Case 2:05-cv-00462   Document 65   Filed in TXSD on 09/12/06   Page 8 of 18

pod, section 1, where plaintiff was housed. *Id. at 51*. Three officers who worked on F-pod were interviewed, and none was aware of any threats toward plaintiff. *Id. at 51-58*.

On November 4, 2005, the UCC reviewed plaintiff's LID claim and the corresponding investigation findings. *Ex. A at 60; Ex. B at 1*. Major Gordy presided as the chairman. *Id.* The UCC found no evidence to support plaintiff's LID claim. *Id.*

On December 21, 2005, plaintiff filed a grievance complaining that the inmates in Ad-Seg were being subjected to cruel and unusual punishment because they were being attacked by other inmates using "slingshots" (made from the elastic in their boxer shorts) to fire spears. *Ex. A at 66-67*. An LID investigation was initiated that day. *Ex. A at 61-68*. Plaintiff refused to be escorted for an interview with the investigating officer, Lieutenant Andrade. *Ex. A at 63-65, 68*. In fact, plaintiff told Officer Garza that he did not have any problems. *Id. at 63-64*.

On December 28, 2005, the UCC reviewed the investigation. *Ex. A at 68; Ex. B at 1*. However, because plaintiff refused to participate in the investigation, the UCC resubmitted his claim for a complete investigation. *Id.*

On February 26, 2006, a spear was found partially inside the A-pod dayroom where plaintiff was recreating. *Ex. E at 2*. Plaintiff told the investigating officer, Sergeant Parham, that he did not know who threw the spear, but that he just turned around and noticed it on the floor. *Ex. H at 50*. Sergeant Parham instigated a search of A-pod cells, and found in cell 15, materials used to make weapons. *Id.* The inmate housed in that cell was Francisco Moreno, a confirmed member of the Texas Syndicate gang. *Ex. E at 1-5; Ex. H at 90*. Moreno was given a major disciplinary case for possession of a weapon and moved to F-pod. *Ex. E at 2-5*.

Sergeant Parham notified Lieutenant James Hager about the weapon and the contraband found in Moreno's cell. *Ex. H at 52*. Sergeant Parham opined that the spear had not been shot, but rather placed there intentionally, because the tip of the spear was not indented. *Id. at 51-52*. Sergeant Parham and Lieutenant Hager generated an Emergency Action Center ("EAC") report, but the report did not specifically mention plaintiff. *Id. at 54*. No LID investigation was initiated as a result of the February 26, 2006, incident. *Ex. H at 64-65*.

On March 6, 2006, plaintiff filed a Step 1 grievance complaining that on February 26, 2006, while he was in A-pod, B-section, an unidentified inmate shot a spear at him. *Ex. G at 8*. None of the officers working A-pod on that date observed the incident, and each officer testified that he or she had no reason to believe plaintiff's life was in danger. *Id. at 13-16*.

On March 14, 2006, the UCC reviewed plaintiff's LID claim and the corresponding investigation. *Ex. H at 70*. Major Gordy presided as chairperson. Id. Plaintiff was removed from the hearing shortly after it began. *Id. at 71*. Thereafter, the UCC denied plaintiff's LID claim finding insufficient evidence. *Ex. G at 7-20; Ex. H at 71-72*.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings,

depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses.  See id. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248-49.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  Caboni, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed."  Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.

## V.  DISCUSSION

### A.      Legal Standard.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); see also Biliski v. Harborth, 55 F.3d 160, 162 (5th Cir. 1995).  An action may be dismissed for failure to state a claim when it is clear that the prisoner can prove no set of facts in support of his claim entitling him to relief.  Oliver v. Scott, 276 F.3d 736, 740 (5th Cir. 2002).  The complaint must be liberally construed in favor of the prisoner and the truth of all pleaded facts must be assumed.  Id.

### B.      Official capacity claims and injunctive relief.

Plaintiff has sued defendants in their official and individual capacities. See D.E. 1.  He seeks monetary damages and  prospective injunctive relief ordering defendants to transfer him off the McConnell Unit.

A suit against a prison employee in his official capacity is the same as a suit against the entity the employee represents.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  The Eleventh Amendment bars a suit for money damages against a state or state agency.  Seminole Tribe of

Florida v. Florida, 517 U.S. 44, 54 (1996).  A judgment may not be entered against a state officer in his official capacity for violating federal law in the past.  Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

To the extent plaintiff is suing defendants in their official capacities for money damages, those claims are barred by the Eleventh Amendment, and they are dismissed.

**C.      Qualified Immunity.**

Defendants moves for summary judgment on the grounds of qualified immunity.  The qualified immunity determination involves a two-step analysis: first, "'whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.'"  Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003) (quoting Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)).  If a constitutional violation is alleged, the Court must next determine "whether the right was clearly established – that is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Id. at 624 (quoting Price, 256 F.3d at 369).  Once defendants have invoked the defense of qualified immunity, the burden shifts to plaintiff to show that the defense is inapplicable.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

The threshold question in a qualified immunity analysis is whether a constitutional right would have been violated on the facts alleged.  Saucier v. Katz, 533 U.S. 194, 200 (2001).

**1.      Failure to protect.**

Plaintiff claims that defendants knew that he was at risk of an inmate assault, yet they ignored that risk when they denied his LID claims and refused to house him in E-pod or F-pod of Ad-Seg., in deliberate indifference to his health and safety.

### *Step 1: Constitutional violation.*

Prison officials have a duty to protect prisoners from violence at the hand of other prisoners. Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). A prison official is deliberately indifferent to the inmate's safety if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Cantu, 293 F.3d at 844 (citing Farmer, 511 at 847). Deliberate indifference describes a state of mind "more blameworthy than negligence"; there must be "more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835.

While admitting that plaintiff has a constitutional right to be protected by prison officials from inmate violence, defendants argue that plaintiff's right is tempered by his reluctance or refusal to participate fully in the LID investigations. Defendants point out that, each time plaintiff made an allegation that his life was in danger, he failed to identify the inmate or inmates that posed a risk to his safety. Defendants argue that it is unreasonable to find that they were aware of a risk to plaintiff's safety if he himself refuses to provide information about that risk. The undersigned agrees.

The uncontested facts establish that, after denouncing his H.P.L. membership, plaintiff became the target for gang retaliation. Spears were shot at him on three different occasions: July 1, 2005; October 19, 2005; and February 26, 2006. *Ex. A at 15, 34*, *and Ex. E at 2.* After each incident, an investigation was conducted; however, plaintiff refused to identify the inmate who allegedly threw the spear. On the July 1, 2005 incident, the only time plaintiff actually was hit by the spear, he signed an offender waiver statement on the very same day requesting that no further action be taken. *Ex. A at 16.* After the October 19, 2005 incident, plaintiff would not tell Lieutenant

Esparza who he saw throw the spear. *Ex. A at 42, 44.* Concerning the February 26, 2006 incident*,* the spear was found partly inside the dayroom. *Ex. E at 2.* Plaintiff did not see anyone shoot it; he turned around and saw it laying on the floor. *Ex. E at 50.* Sergeant Parham opined that the spear was not shot, but laid on the floor intentionally because the tip was not indented. *Ex. E at 51-54.* Plaintiff did not state that the spear was shot at him or that he believed his life was in danger. *Ex. E. At 50, 52, 54.*

To state a constitutional violation, plaintiff must establish that he is incarcerated under conditions posing a substantial risk of serious harm and that defendants were deliberately indifferent to his health or safety. Farmer, 511 U.S. at 834; accord Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998). A prison official cannot be held liable "unless the officfial knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837; accord Newton, 133 F.3d at 308. "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton v. Dimazana, 122 F.3d at 291 (citing Farmer, 511 U.S. at 838-40).

In this case, it cannot be concluded that prison officials unconstitutionally exposed plaintiff to a substantial risk of harm because plaintiff's own refusal to participate in the LID investigations or to identify specific inmates that he believed to be a threat confirms that prison officials had no reason to believe that he was in any more danger than any other inmate. There was no history of prior incidents between plaintiff and any other identifiable inmate. The three incidents occurred suddenly and without warning, and resulted in no serious injuries. In fact, plaintiff was only "speared" once, and that injury was no more than a superficial would requiring antibacterial

14

ointment and a band-aid. *Ex. F at 1.* Concerning the February 2006 incident, the spear was merely

placed in the dayroom. Further, it was not an H.P.L. gang member who alleged placed the spear

there, but a member of the Texas Syndicate. There is nothing in plaintiff's history to suggest

retaliation form this other gang, and as such, there is no way that defendants could have been aware

of this risk.

Moreover, the evidence shows that plaintiff is housed in Administrative Segregation, which

is the most secure form of housing on the McConnell Unit. Having denounced his H.P.L.

membership, plaintiff might have exposed himself to some retalitory risks; however, there is no

evidence that those risks would be any less or greater at any other TDCJ facility. Further, the

evidence is undisputed that, when defendants attempted to protect him from retalitory risks by

learning as much information as they could about potential threats against him, plaintiff was

unresponsive and uncooperative in providing information. It would be unreasonable to expect

defendants to know of a risk that plaintiff himself cannot or will not identify.

Under these circumstances, it cannot be concluded that any act or omission of defendants

knowingly exposed plaintiff to a substantial risk of serious harm. To the contrary, the uncontested

facts establish that defendants made every effort to protect plaintiff from known risks. For example,

in October 2005, after plaintiff was moved from A-pod to E-pod, Lieutenant Esparza learned that

two active H.P.L. members were on E-pod, C section. Lieutenant Esparza then moved plaintiff to

F-pod. *Ex. A at 42, 44.*

Plaintiff's alleged risk of harm is really no greater than any other inmate, save and except

for his gang renunciation, which possibly exposed him to retaliation by active H.P.L. members.

However, the facts demonstrate that defendants addressed this risk by housing plaintiff in Ad. Seg.

and housing him away from active H.P.L. members.  Thus, undersigned finds that plaintiff has failed

to allege a valid constitutional violation of failure to protect because he has failed to demonstrate

that defendants were aware of a known risk to plaintiff's health and safety, but ignored that risk, in

deliberate indifference to his safety and health.

### *Step 2: Objective reasonableness.*

For a right to be clearly established under the second step of the qualified immunity analysis,

"[t]he contours of that right must be sufficiently clear that a reasonable officer would understand that

what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "The

central concept [of the test] is that of fair warning: The law can be clearly established despite notable

factual distinctions between the precedents relied on and the cases then before the Court, so long as

the prior decisions gave reasonable warning that the conduct then at issue violated constitutional

rights.  Hope v. Pelzer, 536 U.S. 730, 740 (2002).  Even officers who interpret the law mistakenly

but reasonably are entitled to immunity.  See Anderson, 483 U.S. at 641.

In the context of an Eight Amendment failure to protect claim, whether defendants' actions

were objectively reasonable depends on whether the defendants both knew of the risk and failed to

take reasonable measures to alleviate it.  Farmer, 511 U.S. at 847.  "[T]he 'failure to alleviate a

significant risk that [the official] should have perceived, but did not, is insufficient to show

deliberate indifference.'"  Domino v. Texas Dep't of Crim. Justice, 239 F.3d 752,, 756 (5th Cir.

2001) (quoting Farmer, 511 U.S. at 833).  Further, "negligence is insufficient to support a finding

of liability.  Adames v. Perez, 331 F.3d 508, 514 (5th Cir. 2003).  That is, prison officials violate

the Eighth Amendment only if they are both aware of a substantial risk to inmate safety *and* fail to

16

respond properly.  <u>Johnson</u>, 385 F.3d at 524.  There is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted.  <u>Id.</u>

When assessing objective reasonableness, it is necessary to articulate the asserted constitutional right more specifically.  <u>Thompson v. Upshur County</u>, 245 F.3d 447, 460 (5th Cir. 2001).  That is, when the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that "all reasonable officials similarly situated would have known that the alleged acts of the defendants violated the United States Constitution."  <u>Id.</u>

As discussed above, plaintiff has failed to establish that there was a known risk to his health and safety that defendants disregarded.  Six LID investigations were conducted between July 2005 and February 2006.  *Ex. A at 24-68; Ex. G at 7-20.*  Initially, plaintiff alleged that active H.P.L. members intended to spear him; however, he now claims that there is a money hit out on him such that all gang members plan to hurt him.  *Ex. A at 49.*  His generalized complaints amount to stating the obvious, that prisons are inherently dangerous places.  As the Supreme Court noted in  <u>Farmer</u>:

> Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another. Regrettably, '[s]ome level of brutality and sexual aggression among [prisoners] is inevitable no matter what the guards do ... unless all prisoners are locked in their cells 24 hours a day and sedated."

<u>Farmer</u>, 511 U.S. at 858-89 (J. Thomas, concurring).

In this case, the numerous LID investigations, moving plaintiff to different pods and sections within Ad. Seg., and the fact that plaintiff, to date, has not been seriously harmed, demonstrate active involvement and concern by defendants as to plaintiff's housing situation.  He is at no greater risk of harm than any other Ad. Seg. inmate.  Defendants' actions have been reasonable, and they are entitled to qualified immunity.

## IV.  **CONCLUSION**

For the reasons stated herein, defendants' motion for summary judgment is GRANTED.

Plaintiff's claims for money damages against defendants in their official capacities are barred by the

Eleventh Amendment, and defendants are granted summary judgment in their favor dismissing

thoseclaims.  Plaintiff's claims against defendants in their individual capacities for money damages

and in their official capacities for injunctive relief are dismissed with prejudice.

ORDERED this 12th day of September, 2006.


_____

  B. JANICE ELLINGTON
  UNITED STATES MAGISTRATE JUDGE